AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

<table>
<tr><td>

**LODGED**
CLERK, U.S. DISTRICT COURT

**5/15/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

</td><td>

for the

Central District of California

</td><td>

**FILED**
CLERK, U.S. DISTRICT COURT

May 15, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CLD _____ DEPUTY

</td></tr>
</table>

United States of America
v.

MIHAI-ADRIAN HUMOIU,

        Defendant(s)

Case No.   2:24-MJ-02849-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1344, 1349, 1028A | Conspiracy to Commit Bank Fraud, Aggravated Identity Theft |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

                                    /s  *Rene Persaud*
                                    _____
                                    *Complainant's signature*

                                    Rene Persaud, Special Agent
                                    _____
                                    *Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   May 15, 2024                _____
                                    *Judge's signature*

City and state:   Los Angeles, California      Hon. Alka Sagar, U.S. Magistrate Judge
                                    _____
                                    *Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AFFIDAVIT**

I, Rene Persaud being duly sworn, declare and state as follows:

**INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2018.  Prior to becoming a SA, I worked for the FBI's Special Surveillance Group for approximately four years.  Prior to joining the FBI, I was a Deputy Sheriff for the Hillsborough County (Florida) Sheriff's Office for approximately three years.

2.   I have participated in various aspects of criminal enterprise investigations, including but not limited to, conducting surveillance and arrests, issuing subpoenas, seizing and impounding drug evidence, social media analysis, and the analysis of telephone tolls and other data.  Additionally, I have interviewed and/or debriefed confidential informants and other witnesses who have had knowledge regarding the investigations in which I have been involved. I have also authored, sworn out, and executed multiple search warrants for various entities, including but not limited to, internet service providers, social media companies, GPS tracking units, and physical residences/businesses.

3.   I also have extensive experience investigating Romanian Organized Criminal Groups. I have conducted investigations in the Los Angeles area related to the ATM skimming activity and money laundering, and I have also traveled to Romania on multiple occasions to work with National Police forces in several cities in order to obtain information, coordinate investigations, and identify criminals

who travel from Europe to the United States to defraud the American banking system.

**PURPOSE OF AFFIDAVIT:   COMPLAINT and SEARCH WARRANT**

4.   This affidavit is made in support of a complaint against MIHAI-ADRIAN HUMOIU for conspiracy to commit bank fraud, and aggravated identity theft, in violation of Title 18, United States Code, Sections 1344, 1349, and 1028A (the TARGET OFFENSES).

5.   This affidavit is also made in support of search warrants for the residence and vehicle of HUMOIU for evidence of bank fraud, identity document fraud, money laundering, conspiracy to commit the same, and aggravated identity theft, in violation of Title 18, United States Code, Sections 1028, 1344, 1349, 1956, and 1028A, as described in Attachment B, which is incorporated by reference.

6.   The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained through my review of evidence, investigative reports, and information provided by others, including other law enforcement partners.  As this affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

**PREMISES TO BE SEARCHED**

7.   The premises to be searched (collectively the "SUBJECT PREMISES") are:

a.   3124 CURTS AVENUE, LOS ANGELES, CA (the "TARGET RESIDENCE"), described more fully in attachment A, which is incorporated by reference.

b.   BLACK BMW X5, California plate 9BEB156, VIN 5UXCR4C04L9C95272, registered to Valentino Voicu, and driven by MIHAI-ADRIAN HUMOIU ("TARGET VEHICLE").

**STATEMENT OF PROBABLE CAUSE**

**Summary:**

8.   Since December 2021, the Federal Bureau of Investigation has been investigating a Romanian Organized Crime Group (OCG) operating in the United States. The primary criminal scheme orchestrated by this Romanian OCG is Access Device/Bank Fraud. This Romanian OCG carries out the fraud by installing skimming devices in ATM card readers and Point-of-Sale terminals, stealing customer credit card numbers and their PIN numbers, then fraudulently withdrawing cash from victim customer accounts. This is corroborated by information provided by Romanian Law Enforcement, observations made during physical surveillance, the analysis of banking records, and the review of surveillance footage which captures individuals installing and removing skimming devices as well as unlawfully accessing and withdrawing cash from victim customer accounts in and around Los Angeles, CA.

9.   One of the individuals participating in this scheme is MIHAI-ADRIAN HUMOIU. HUMOIU has been involved in all aspects of ATM and Point-of-Sale skimming to include, but not limited to, conducting unauthorized cash withdrawals from ATMs and installing skimming devices since at least September 2021.

**Regulatory Background of CalFresh and CalWORKs Programs:**

10.   The California Department of Social Services (DSS) is a government agency that administers several benefit and assistance programs for residents of the state of California.  One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs.  Another assistance program administered by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

11.   Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com.  Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

12.   CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards").  EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions.  For example, you can use an EBT card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

13.   The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

14.   Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each

month.  Those benefits are deposited directly from DSS into the
account of the EBT cardholder.

15.  The EBT cardholders can then conduct cash withdrawals at
automated teller machines ("ATMs") using a personal identification
number ("PIN") established by the card holder.  The EBT cardholder
presents the card at an ATM, inserts the card into the ATM card
reader, and utilizes a PIN to withdraw the funds previously deposited
by DSS intended for beneficiaries of the CalFresh or CalWORKs
programs.

**Background on ATM Skimming and Access Device Fraud:**

16.  Based on my training and experience in investigating
fraudulent schemes of this nature, I know the following about Access
Device Fraud: ATM skimming devices are manually installed at walk-up
or drive-thru ATM terminals. The card readers are surreptitiously
inserted into the ATM card reader slots, and are often thin enough to
go unnoticed to a lay person using an ATM. In addition to the card
reader, another device is installed to obtain the PIN number. This
device is often a covert camera that captures customers entering
their PIN number.

17.  An ATM skimming device is installed for a period of time
after which the subjects who installed the device will return to the
ATM and remove it. Once the device is removed, the customer credit
card numbers and PIN numbers are retrieved from the device. The card
numbers are then loaded on to blank cards so the perpetrators can
travel to ATMs and fraudulently withdraw funds from victim customer
accounts.

18.   In addition to ATM skimmers, there are also devices known as Point-of-Sale skimmers. These devices are built to mimic the Point-of-Sale terminals at commercial businesses such as pharmacies, grocery stores, gas stations, and department stores. Because of the near identical design, these devices are installed by simply snapping them on top of legitimate Point-of-Sale terminals in order to steal customer data when they complete their purchases at the above listed establishments. The data from these Point-of-Sale skimmers can be retrieved by recovering the device and downloading the data, or by downloading via Bluetooth when in close proximity to the device.

19.   Based on my training and experience, I believe that members of the conspiracy I am investigating used the skimming techniques described above to capture the EBT card data of unsuspecting consumers.  Historically, EBT cards have been issued by Bank of America.  In my training and experience, all of the banks mentioned in this affidavit are federally insured.

**HUMOIU Uses the HUMOIU Telephone to Communicate About Stolen EBT Cards**

20.   In March 2024, the Honorable Magistrate Judge Pedro V. Castillo issued a federal search warrant for the residence and vehicle of one of HUMOIU's co-conspirators in the Central District of California. During this search, numerous digital devices were seized to include cellular phones and laptop computers. After analyzing the contents of these devices, I discovered a conversation with a "Rondi Belutu De Mari" using a telephone number with a United Kingdom Country Code. In this conversation, the co-conspirator referred to "Rondi Belutu De Mari" as "RONDEL". Based on information provided by

Romanian Law Enforcement, I know that "RONDEL" is a nickname for HUMOIU.

21.   After identifying HUMOIU as "RONDEL", I conducted additional searches of the seized digital devices to look for evidence of skimming activity involving "RONDEL," HUMOIU's username (hereafter referred to as HUMOIU for clarity). I discovered two Microsoft Word files on a laptop computer documenting the amount of stolen EBT card numbers that HUMOIU and others sent to the co-conspirator. The files served as a master list to document and itemize stolen EBT cards numbers from multiple skimming groups in January and February 2024 (hereafter referred to as the JANUARY LIST and FEBRUARY LIST for clarity). The total files received in the JANUARY LIST and FEBRUARY LIST were documented as "TOTAL GENERAL IANUARIE" and "TOTAL GENERAL FEBRUARIE", which when translated from Romanian means "General Total January" and "General Total February". In addition, the JANUARY LIST and FEBRUARY LIST were created on February 10, 2024 and March 11, 2024 respectively.

22.   The JANUARY LIST is extremely detailed and itemizes each individual file of stolen EBT cards that skimming groups provided to the co-conspirator. For example, the document shows that one group sent 11 separate files, two of which were named "fete de sunat ianuarie finu - 509 BUC" and "fete k.k. ian - 484 BUC". "BUC" is a Romanian word that translates to "each".

23.   I was able to recover the files named "fete de sunat ianuarie finu" and "fete k.k. ian" from the same laptop computer, and corroborated they each contained 509 and 484 stolen California EBT cards. Based on this corroboration, I believe the JANUARY LIST and

FEBRURARY LIST to be an accurate representation of the stolen EBT cards he received from skimming groups.

24.  The FEBRUARY LIST did not itemize files but did document how many stolen EBT cards skimming groups sent to the co-conspirator. Specifically, HUMOIU is documented sending hundreds of cards this month as follows:

*RONDEL*

*TOTAL: 783 BUC*

25.  As previously discussed, "BUC" is the Romanian word for "each" and the documentation has proven to be accurate, so it appears HUMOIU sent 783 stolen EBT cards in February 2024.

26.  In addition, the co-conspirator also sent HUMOIU two different messages that shared a link to https://bideu.online/, a file share service similar to www.sendspace.com, to download excel files that contained stolen EBT cards. Each of file was password protected on https://bideu.online/ with the username/password combination of RONDEL/RONDEL. These messages also detailed state the EBT card belonged to as well as the number of stolen cards in each file. For example, a message sent read as follows:

*CUSTOMER: RONDEL*

*PASSWORD: RONDEL*

*STATE: California*

*FILE: numai ebt feb.csv*

*CARDS COUNT: 553*

*LINK: https://cacat.bideu.online/kt*

27.  Based on these messages and the FEBRUARY LIST, the cards were likely sent to the co-conspirator to have their cash balances

checked, then returned to HUMOIU to be cloned and used to conduct
unauthorized cash withdrawals from victim customer accounts.

28.  I conducted a search of the co-conspirator's digital
devices and located a WhatsApp account with the same telephone number
and United Kingdom Country Code as was used in the conversation
discussed previously with "Rondi Belutu De Mari" in which a co-
conspirator called "Rondi Belutu De Mari" "RONDEL" (i.e., HUMOIU). I
will refer to this WhatsApp account as HUMOIU's WhatsApp account. In
April 2024, I obtained a data Pen Register for HUMOIU's WhatsApp
account. The data provided from this Pen Register allowed me to
determine the IP address of the physical device that was used to
access HUMOIU's WhatsApp account. According to T-Mobile records, that
IP address belonged to a cellular telephone I will call the HUMOIU
Telephone. As of May 6, 2024, this same IP address showed that HUMOIU
used the HUMOIU Telephone to access his WhatsApp account in Los
Angeles.

**HUMOIU Resides at the TARGET PREMISES and Drives the TARGET VEHICLE:**

29.  On May 8, 2024, the Honorable Magistrate Judge Karen L.
Stevenson issued a Search Warrant to track and obtain historical
location records for the HUMOIU Telephone. Using this data, I
determined HUMOIU's cellular phone was consistently located within
100 meters of the TARGET PREMISES between April 17, 2024 and the
present day during overnight hours, as though HUMOIU resided there.

30.  On May 9, 2024, I personally observed HUMOIU drive the
TARGET VEHICLE and park it in the driveway of TARGET PREMISES, then
walk towards the TARGET PREMISES on foot. On May 13, 2024, I again

9

observed the TARGET VEHICLE parked in the main driveway of the TARGET PREMISES.

31.   Records checks associated with the TARGET PREMISES indicate that 3124 is the only house number for the property; the outbuilding next to the garage does not have an address.  According to apartments.com, the TARGET PREMISES is no longer seeking a tenant ("Check Back Soon for Upcoming Availability"), but was listed as a single rental property that included the main house, the garage, and the second outbuilding which was listed as a "studio/Guest room."

32.   As discussed previously, in March 2024 the Honorable Magistrate Judge Pedro V. Castillo issued a federal search warrant for the residence and vehicle of one of HUMOIU's co-conspirators in the Central District of California. The registered owner of the TARGET VEHICLE is the same person who owned the vehicle used by HUMOIU's co-conspirator. Based on my training and experience, Romanian criminals often rent vehicles from particular individuals rather than brand name rental companies (i.e. Hertz, Thrifty, Enterprise) because these individuals do not require the same level of identification or financial backing to rent their vehicles.

**HUMOIU Has Been Involved In ATM Skimming Since 2021:**

33.   HUMOIU committed several ATM skimming acts since 2021 in and around the Central District of California. This activity included installing and removing ATM and Point-of-Sale skimming devices, as well as unauthorized cash withdrawals from victim customer accounts. I have reviewed surveillance video and/or images of all the below listed unauthorized cash withdrawals, skimming device installations, and identity cards mentioned in the below overt acts and law

enforcement encounters. In each instance, I was able to positively identify HUMOIU as the individual present for each incident. I have reviewed several photos of HUMOIU provided by Romanian Law Enforcement, and photos posted on HUMOIU's now deleted social media accounts. Based on a comparison of the photos from the incidents below, I was able to confirm HUMOIU's identity in each instance.

**HUMOIU Installed Skimmers at ATMS in 2021 and 2022:**

34.   In 2021 and 2022, several Comerica Bank branches discovered skimming devices installed at ATM terminals throughout the state of California. Investigator Kevin Koss of Comerica Bank provided me with several images of individuals installing and removing ATM skimming devices and pinhole cameras at these branches. Based on my review of these images, I recognized HUMOIU conducting this activity on more than one occasion.

35.   I reviewed images of an ATM skimming device being installed at a Comerica Bank branch located at 1650 Ximeno Avenue, Long Beach, CA on September 28, 2021. In these images, HUMOIU and an unknown individual approached the walk-up ATM terminal and installed an ATM skimming device and pinhole camera.

36.   I also reviewed images of ATM skimming devices being installed at a Comerica Bank branch located at 1960 41st Ave, Capitola, CA on March 4, 2022. In these images, HUMOIU approached the drive-thru ATM in his vehicle and installed an ATM skimming device in the card reader. HUMOIU then retrieved a pinhole camera from the back seat of his vehicle and installed it at the same ATM terminal. HUMOIU then parked his vehicle, approached the walk-up ATM terminal at the same Comerica Bank branch, and installed an ATM skimming device and

pinhole camera before departing in this vehicle. Approximately 12 hours later, HUMOIU and an unknown individual returned to the same Comerica Bank branch and removed the skimming devices and pinhole cameras from both ATMs.

37.  I reviewed these images, and I was able to identify HUMOIU installing the ATM skimming devices and pinhole cameras in Capitola and Long Beach. HUMOIU's face was clearly visible and unobstructed in each incident.

**HUMOIU Uses Other Persons' Accounts to Withdraw Cash from ATMs in 2023:**

38.  Based on records provided by Wells Fargo, I was able to locate evidence of HUMOIU conducting unauthorized cash withdrawals in December 2023.  According to Wells Fargo records, on or about November 1, 2023, between approximately 7:34 AM and 7:42 AM, HUMOIU was captured on surveillance video conducting unauthorized cash withdrawals from victim customer accounts at the Wells Fargo ATM located at 1600 Vine Street, Los Angeles, CA. HUMOIU wore a black sweater with images of the basketball player Kobe Bryant in a yellow and purple Los Angeles Lakers uniform, a black baseball cap with a red/orange colored brim, light colored shorts, and sandals.

39.  I reviewed the photos from the surveillance video of HUMOIU. I was able to positively identify HUMOIU as the subject conducting unauthorized cash withdrawals. Wells Fargo provided records regarding the EBT cards used by HUMOIU. It was determined that funds were unlawfully withdrawn from six EBT cards in the names of different victims totaling approximately $7,450.

**HUMOIU Uses Multiple Aliases as Recently as March 2024**

40.   Since 2021, I was able to locate three instances where HUMOIU possessed or attempted to obtain alias identity documents. I know this because I reviewed booking photos, driver's licenses, and passports bearing HUMOIU's face but different names.

41.   First, I located a Washington State Driver's License under the name "Nester Mikulas", issued in May 2022. I reviewed the DMV records and photo associated with "Nester Mikulas" and confirmed that the picture on this driver's license belonged to HUMOIU.

42.   Second, HUMOIU was charged with ATM skimming violations in Torrance, CA in February 2021. HUMOIU provided the alias "Jozef Krasov" at the time of his arrest. I reviewed the booking photo of "Jozef Krasov" and confirmed that this was actually HUMOIU.

43.   Finally, in March 2024 the U.S. Customs and Border Patrol alerted me to a package intercepted and seized during an inspection. This package contained a Spanish Passport, Spanish Identity Card, and European Union Identity Card under the name "Emilano Tores". I reviewed photos of these identity documents and confirmed that all the documents with the name "Emilano Tores" had a photo of HUMOIU on them.

44.   Based on my training and experience, sophisticated organized criminals will often use multiple identities to mask their true identity and avoid discovery from law enforcement and the courts in multiple jurisdictions.

**HUMOUI's Immigration and Criminal History**

45.   According to his criminal history, HUMOIU was arrested in February 2021 in Torrance, California for state charges related to

13

identity theft. The disposition of this arrest is currently unknown. During this arrest, HUMOIU provided his "Jozef Krasov" alias, and was charged under this name. In December 2022, HUMOIU was arrested in Sumner County, Tennessee and charged with 25 counts of identity theft. This case has not yet been adjudicated. According to records from the Sumner County Clerk of Court, HUMOIU was also charged under his "Jozef Krasov" alias.

46.   According to records provided by Romanian Law Enforcement, HUMOIU was charged with an unspecified violent crime in Palma de Mallorca, Spain in 2012 and served nine months in a Spanish jail. In addition, HUMOIU was charged and convicted in Le Havre, France for smuggling devices used for cyber-crimes in 2023. HUMOIU has an active European Arrest Warrant issued by the Le Havre Court to serve two years in prison for this offense.

47.   According to immigration records, there is no record of HUMOIU or any of his aliases entering the United States through a Port of Entry, as I know from my training and experience there should be if he entered the U.S. legally; HUMOIU has no legal immigration status in the United States.

**Profitability of ATM Skimming Schemes**

48.   Images from various social media posts show HUMOIU spending money stolen from EBT customers on expensive dinners, trips to various cities in the United States, and vacations to Universal Studios.

49.   Based on my training and experience investigating organized crime, the exploits of HUMOIU are consistent with the way sophisticated criminals will flaunt their illegally obtained wealth,

14

which in this case was obtained from the most financially vulnerable in society.

**Training and Experience Regarding Identity Theft and ATM Skimming**

50.   From my training and experience, and from discussions with other government officials, I know the following:

a.   Members of ATM skimming crews maintain specialized equipment including skimmers, thin metal tools (often custom fabricated) to aid in the surreptitious insertion and removal of the skimmers, spy cameras to record PINs entered by customers, and magnetic strip reader-writers for counterfeiting ATM cards.  Often times they possess plastic or metal housings designed to camouflage the spy cameras and make them blend in with the ATM.  Often they have these custom made at plastic- or metal-working shops.  Typically they have a stock of blank magnetic-strip cards, sometimes repurposed from gift cards, onto which they can write their stolen account information.  The crew members usually write the PIN codes for the cards directly onto the counterfeits they produce.

b.   Members of transnational ATM skimming crews typically enter the country either legally with a visa, if they have no criminal record and can pose as a legitimate tourist or business person, or through established immigrant-smuggling rings in Mexico and Canada otherwise.  Oftentimes the crew members maintain false identity documents, which they use if arrested to make it harder to identify them.  Some maintain false passports so that they can abscond if granted bail and flee the country.

c.   Members of transnational ATM skimming crews have various ways of handling the proceeds of their offenses.  Some is

kept in cash for routine expenses.  Some is usually deposited into a local bank account to pay for items for which cash would raise suspicion, such as rental cars and housing.  The bulk, however, is sent abroad either to their co-conspirators or home countries.  This may be as simple as sending cash hidden among other items abroad through carriers such as DHL, or transfers through banks, Hawalas, Western Union, or similar services.  More recently, the trend has been to purchase cryptocurrencies for cash.

d.    Individuals involved in identity theft schemes like this one must keep evidence of their schemes, such as contact information for their co-conspirators, lists of victim information and accounts used in the scheme, simply to keep the scheme going. Much of this evidence is now stored on digital devices such as computers and smartphones.

e.    Generally, perpetrators of skimming and identity theft schemes maintain this evidence where is close at hand and safe, such as in their residences, automobiles, and, especially with smartphones, on their person.  For larger or more sophisticated frauds, participants often attempt to distance themselves from some of the incriminating evidence by renting public storage units or safety deposit boxes where they often keep the items they will not need immediate access to.

f.    I have heard of cases in which card skimmers have embossed their own names on the front of counterfeit access devices so that they could use the counterfeit cards openly and with their own identification cards.  I know from my training and experience that card skimmers and counterfeiters often re-encode gift cards that

have no value left on them as credit or debit cards.  This is both convenient for them as they can get their counterfeit stock for free and it makes the cards appear legitimate without elaborate additional printing on them of logos and the like; the counterfeit credit and debit cards simply appear to be a gift card from a store.  Both these techniques will likely prevent law enforcement from being able to tell if the facially legitimate looking cards are actually part of the skimming scheme just from seeing at them.

g.    Members of a criminal conspiracy must of necessity communicate with one another.  Commonly this is done by text, VOIP, email, telephone, or specialty communication application, often an encrypted one such as WhatsApp, and most often by smartphone. Members of the conspiracy commonly carry their smartphones, which include the contact information for their co-conspirators, on or near their persons, such as in their cars or residences.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

51.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

1          d.    Digital device users can also attempt to conceal data

2    by using encryption, steganography, or by using misleading filenames

3    and extensions.  Digital devices may also contain "booby traps" that

4    destroy or alter data if certain procedures are not scrupulously

5    followed.  Law enforcement continuously develops and acquires new

6    methods of decryption, even for devices or data that cannot currently

7    be decrypted.

8       52.  Based on my training, experience, and information from

9    those involved in the forensic examination of digital devices, I know

10   that it is not always possible to search devices for data during a

11   search of the premises for a number of reasons, including the

12   following:

13         a.    Digital data are particularly vulnerable to

14   inadvertent or intentional modification or destruction.  Thus, often

15   a controlled environment with specially trained personnel may be

16   necessary to maintain the integrity of and to conduct a complete and

17   accurate analysis of data on digital devices, which may take

18   substantial time, particularly as to the categories of electronic

19   evidence referenced above.  Also, there are now so many types of

20   digital devices and programs that it is difficult to bring to a

21   search site all of the specialized manuals, equipment, and personnel

22   that may be required.

23         b.    Digital devices capable of storing multiple gigabytes

24   are now commonplace.  As an example of the amount of data this

25   equates to, one gigabyte can store close to 19,000 average file size

26   (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27

28

53.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. ~~However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among~~

1    ~~those that will unlock the device via biometric features, and it is~~

2    ~~also possible that the person in whose possession the device is found~~

3    ~~is not actually a user of that device at all.   Furthermore, in my~~

4    ~~training and experience, I know that in some cases it may not be~~

5    ~~possible to know with certainty who is the user of a given device,~~

6    ~~such as if the device is found in a common area of a premises without~~

7    ~~any identifying information on the exterior of the device.~~   Thus, if

8    while executing the warrant, law enforcement personnel encounter a

9    digital device within the scope of the warrant that may be unlocked

10   using one of the aforementioned biometric features, the warrant I am

11   applying for would permit law enforcement personnel to, with respect

12   to ~~every person~~ MIHAI-ADRIAN HUMOIU who is located at the TARGET PREMISES during the

13   execution of the search who is reasonably believed by law enforcement

14   to be a user of a biometric sensor-enabled device that falls within

15   the scope of the warrant: (1) depress ~~the person's~~ MIHAI-ADRIAN HUMOIU's thumb- and/or

16   fingers on the device(s); and (2) hold the device(s) in front of the

17   face of ~~the person~~ MIHAI-ADRIAN HUMOIU with his ~~or her~~ eyes open to activate the facial-,

18   iris-, and/or retina-recognition feature.

19           d.   In my training and experience, transnational ATM

20   skimmer crews often reside together to better coordinate their

21   efforts.   This is especially true for persons involved in installing

22   ATM skimming devices, and producing counterfeit cards, which requires

23   specialized tools and equipment.   One of the last search warrants I

24   executed on such a residence yielded a skimming lab that covered the

25   dining room table; the residence housed four different crew members,

26   all of whom pled guilty to a federal felony.   I have not seen a

27   skimming operation in which non-criminal participants were also

28

21

present.  Indeed, it would be foolhardy to have non-criminal participants present at such a lab, as the illegal conduct would be visible to them, and they might inform the authorities or otherwise compromise the secrecy the crew members require.

54.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

**CONCLUSION**

55.  Based upon the foregoing facts and my training and experience, I believe there is probable cause to believe that the HUMOIU conspired to commit bank fraud and committed aggravated identity theft in violation the TARGET OFFENSES, and that evidence of the violations listed in Attachment B will be found at the SUBJECT PREMISES.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  15th   day of May, 2024.

_____

UNITED STATES MAGISTRATE JUDGE
ALKA SAGAR

**Complaint Attachment**

Count One, 18 U.S.C. § 1349

Beginning in or before 2021, and continuing through at least May 15, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant MIHAI-ADRIAN HUMOIU ("Defendant"), and others, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344.  The object of the conspiracy was carried out, and to be carried out, in substance, as follows:   Defendant would secretly install skimming devices in ATMs to record the account information of bank customers, and would then counterfeit debit and credit cards bearing that information.  Defendant and his co-conspirators would use the counterfeit cards to withdraw funds in the names of those victims of identity theft.  Federally-insured financial institutions defrauded as a result of this conspiracy include Wells Fargo Bank, Comerica Bank, and Bank of America.

Count Two, 18 U.S.C. § 1028A

Beginning in or before 2021, and continuing through at least May 15, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant MIHAI-ADRIAN HUMOIU knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.